NO. 06-1624

RANDY FONTENOT, ET AL.

VERSUS

PATTERSON INSURANCE, ET AL.

CONSOLIDATED WITH

NO. 06-1625

GERMAINE BROOKS, ET AL.

VERSUS

CITY OF LAFAYETTE, ET AL.

************

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT,
PARISH OF LAFAYETTE, NOS. 2001-2002, 2001-2216
HONORABLE DURWOOD CONQUE, DISTRICT JUDGE

ON REMAND FROM THE LOUISIANA SUPREME COURT

************

JIMMIE C. PETERS
JUDGE

************

Court composed of Chief Judge Ulysses Gene Thibodeaux, Sylvia R. Cooks, Jimmie
C. Peters, Elizabeth A. Pickett, and J. David Painter, Judges.

AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.

PICKETT, J., DISSENTS AND ASSIGNS WRITTEN REASONS.

**Lawrence N. Curtis**
**Lawrence N. Curtis, LTD**
**Post Office Box 80247**
**Lafayette, LA 70598-0247**
**(337) 235-1825**
**COUNSEL FOR PLAINTIFFS/APPELLANTS/APPELLEES:**
    **Randy Fontenot and Susanne Fontenot**

**Rickey W. Miniex**
**Clyde R. Simien**
**Todd M. Swartzendruber**
**Holli K. Yandle**
**Simien & Miniex**
**Post Office Box 81918**
**Lafayette, LA 70598-1918**
**(337) 269-0222**
**COUNSEL FOR DEFENDANT/APPELLEE/APPELLANT:**
    **Lafayette City-Parish Consolidated Government**

**Colleen McDaniel**
**Assistant Attorney General**
**Louisiana Department of Justice**
**Division of Risk Litigation**
**556 Jefferson Street, 4th Floor**
**Lafayette, LA 70501**
**(337) 262-1700**
**COUNSEL FOR DEFENDANT/APPELLEE/APPELLANT:**
    **The State of Louisiana Through The**
    **Department of Transportation and Development**

PETERS, J.

These consolidated actions are again before us, this time on remand from the supreme court. When these matters were first before us, we attempted to reconcile conflicting decisions rendered by the jury and the trial court in a bifurcated trial by performing a *de novo* review of the record. *Fontenot v. Patterson Ins. Co.*, 06-1624, 06-1625 (La.App. 3 Cir. 12/5/07), 972 So.2d 401. One of the defendants, the State of Louisiana, Department of Transportation and Development (DOTD), filed an application for supervisory writs with the supreme court questioning whether this court applied the proper standard of review in reaching our decision. In remanding the matter to this court, the supreme court did not reach the issue raised by DOTD. Instead, it concluded that the issues and parties remaining at the time of the trial on the merits were so aligned that a bifurcated trial was improper. Thus, on remand, the supreme court ordered that this court review only the jury's decision, and do so by applying the manifest error standard of review. *Fontenot v. Patterson Ins. Co.*, 08-0414 (La. 12/12/08), ____ So.2d ____. We have complied with the instructions of the supreme court and, in doing so, conclude that the jury manifestly erred in its allocation of fault; reallocate fault in causing the accident; affirm the jury's quantum award as amended by the trial court's judgment notwithstanding the verdict; render judgment in accordance with these percentages of fault; affirm the judgment awarding legal interest, as amended; and recast the judgment for costs.

## DISCUSSION OF THE RECORD

As has been stated in the opinions previously rendered, this litigation arises from an automobile accident that occurred at the intersection of Morgan and Main Streets in Broussard, Louisiana, a few moments after 11:00 p.m. on March 23, 2001. At that time, a vehicle driven by Germaine Brooks and occupied by Charlotte Phillips

entered the intersection and collided with a vehicle driven by Randy Fontenot and owned by the Lafayette City-Parish Consolidated Government (City-Parish). Both vehicles sustained significant damage, both drivers sustained severe personal injuries, and Ms. Phillips died as a result of the injuries she sustained in the accident.

At the time of the accident, Randy Fontenot, a City-Parish policeman, was proceeding east on Main Street in the direction of the Morgan Street intersection. Germaine Brooks was driving south on Morgan Street, approaching the same intersection. Both Main and Morgan Streets are part of the Louisiana State Highway System. A sequencing traffic light designed, constructed, and maintained by DOTD controls the flow of traffic through the intersection with the standard red-yellow-green sequenced traffic signals operating between 5:00 a.m. and 11:00 p.m. each day. At 11:00 p.m., the traffic signal automatically switches to a flashing mode with the yellow light flashing for Main Street, the favored street, with the red light flashing for Morgan Street. At the time of the accident, the light had switched to the flashing mode.

Mr. Brooks' vision in the direction of Mr. Fontenot's oncoming vehicle was impaired by a four-story brick building that houses a library and is situated on the northwest corner of the intersection. Approximately one year before the accident, DOTD had taken the steps to overlay and widen the intersection. This activity included the addition of a left-turning lane in all four approaches, which were further controlled by a stop bar on the pavement. However, DOTD failed to paint a stop bar on any of the other approaching lanes.

As has been set out in the prior opinions, the suits arising from this accident resulted in a number of combinations of plaintiffs and defendants through the

2

principal demands as well as the ancillary demands. However, when the trial on the merits occurred, the only claims left were those of the Fontenots and the City-Parish[1] against Mr. Brooks, the Louisiana Insurance Guaranty Association (LIGA),[2] and DOTD. At trial, the claims of the Fontenots were decided by a jury and the claims of the City-Parish were decided by the trial court.[3]

Liability was the main factual dispute[4] at trial. The jury returned a verdict assessing Mr. Brooks with ninety percent of the fault causing the accident and assessing Mr. Fontenot with the remaining ten percent. The jury then awarded Mr. Fontenot the following damage awards:

Past medical expenses - $255,000.00

Past wages loss - $176,512.00

Lost future wages and earning capacity - $250,000.00

Additionally, the jury awarded Mrs. Fontenot $10,000.00 and the Fontenots' minor daughter $5,000.00 for loss of consortium.

In considering the City-Parish's intervention claim against the same three defendants, the trial court found that the City-Parish was entitled to recover

---

[1]The City-Parish had, through an intervention in the Fontenots' suit, sought recovery for medical expenses and workers' compensation benefits paid to Mr. Fontenot and for the damage to the vehicle driven by Mr. Fontenot. However, only the vehicle damage issue is before us.

[2]LIGA was substituted for Mr. Brooks' insolvent insurer pursuant to La.R.S. 22:1375-1394, the Louisiana Insurance Guaranty Association Law.

[3]The parties stipulated to the amount of damage to the vehicle driven by Mr. Fontenot. Thus, only the degree of fault of the parties was at issue.

[4]The extent of Randy Fontenot's personal injuries was not seriously disputed. In reasons for judgment dated July 13, 2005, the trial judge described Mr. Fontenot's injuries as "multiple injuries, including a right ankle fracture with tendon avulsion, right heel fracture, right patella fracture, fractures of the right hand, compression fractures of the thoracic spinal vertebrae, right lower leg fracture, three fractured ribs, lung contusion, cardiac contusion, facial lacerations and laceration of the spleen." The trial court further found that "Mr. Fontenot was in coma for several weeks. He had a number of surgeries to repair his injuries and was treated for post traumatic stress disorder, anxiety, neurosis and depression."

$19,994.87 for the property damage to its vehicle,[5] but apportioned fault for that damage equally between Mr. Brooks and DOTD. Thus, the jury found no fault on the part of DOTD and the trial court found no fault on the part of Mr. Fontenot.

The Fontenots challenged the jury's findings by filing a judgment notwithstanding the verdict (JNOV), or in the alternative a motion for a new trial. This pleading addressed the jury's allocation of fault and its failure to award general damages. The trial court granted the JNOV as to the general damages complaint, awarding Mr. Fontenot $500,000.00 in general damages, but denied the request for reallocation of fault. Thereafter, the trial court executed three separate judgments—one with regard to its judgment on the City-Parish's claim, and two with regard to the jury verdict and its subsequent grant of the JNOV. In separate appeals, the Fontenots, the City-Parish, and DOTD appealed the allocation of fault. Additionally, in its appeal, DOTD claimed that the general damage award granted Mr. Fontenot through the JNOV was excessive.

**OPINION**

When first considered by us, all the litigants presented this case as a bifurcated trial wherein the jury and trial court had rendered conflicting verdicts. Thus, our first inquiry was the standard of review to be applied. We recognized the unsettled nature of the law in this area and noted that our own circuit had tried different approaches in fulfilling our review obligations. *See Hebert v. Rapides Parish Police Jury*, 05-471 (La.App. 3 Cir. 7/12/06), 934 So.2d 912, *rev'd on other grounds*, 06-2001, 06-2164 (La. 4/11/07), 974 So.2d 635, and *McDaniel v. Carencro Lions Club*, 05-1013 (La.App. 3 Cir. 7/12/06), 934 So.2d 945, *writ denied*, 06-1998 (La. 11/3/06), 940

---

[5]The City-Parish had sought recovery for medical expenses and workers' compensation weekly benefits paid to Mr. Fontenot. However, that part of the judgment is not before us on appeal.

4

So.2d 671. We chose to use the *de novo* approach as applied in *Hebert*. In doing so, we affirmed the jury's award of damages as amended by the trial court's grant of the JNOV and reversed the jury's allocation of fault and reallocated fault in the same percentages reached by the trial court: fifty percent to DOTD and fifty percent to Mr. Brooks.

In its remand, the supreme court instructed us to ignore the trial court judgment on the City-Parish's ancillary demand, to consider only the apportionment of fault as determined by the jury, and to consider that determination under the manifest error standard of review. It reached its decision by noting that, by the time the matter came to trial, all claims *against* the City-Parish had been resolved, and thus, all remaining issues should have been tried by jury.

### Allocation of Fault

As previously stated, the jury assessed ninety percent of the fault in causing the accident to Mr. Brooks and assessed the remaining ten percent to Mr. Fontenot. The trial court declined to change this assessment when presented with the opportunity through the motion for JNOV, but obviously disagreed with the determination, given its separate judgment on the issue. However, as instructed by the supreme court, we will not consider the trial court's judgment, but only that of the jury. In considering the jury verdict under the manifest error scope of review, we are mindful of the requirement that credibility determinations are for the trier of fact, and that "reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable." *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989).

5

Fault in causing an accident is determined under the five-step duty-risk analysis which we set forth in our original opinion as follows:

> This is a five-step process which requires that a party asserting fault on another establish (1) that the party whose fault is at issue had a duty to conform his conduct to a specific standard, 2) that the party's conduct failed to conform to the appropriate standard, (3) that the party's conduct was a cause-in-fact of the injuries at issue, (4) that the party's substandard conduct was a legal cause of the injuries at issue, and (5) that there were actual damages. *Toston v. Pardon*, 03-1747 (La. 4/23/04), 874 So.2d 791. A party asserting comparative fault bears the burden of proof by a preponderance of the evidence that the other party's fault was a cause-in-fact of the damage complained of. *Watson v. Brazeel*, 36,499 (La.App. 2 Cir. 12/18/02), 833 So.2d 1276, *writ denied*, 03-217 (La.04/04/03), 840 So.2d 1215. The cause-in-fact element generally involves a "but for" inquiry which questions whether or not the injury would have occurred "but for" the defendant's substandard conduct. *Petre v. State ex rel. Dept. of Transp. & Dev.*, 00-545 (La.App. 3 Cir. 12/29/00), 775 So.2d 1252, *aff'd* 01-876 (La. 4/3/02), 817 So.2d 1107. Additionally, fault in a vehicular collision case is determined by judging the conduct of each motorist under the facts and circumstances of each particular case. *Matthews v. Arkla Lubricants Inc.*, 32,121 (La.App. 2 Cir. 8/18/99), 740 So.2d 787.

*Fontenot*, 972 So.2d at 409.

In considering the first of the five steps, we noted in our original opinion that "[b]ecause Mr. Fontenot was facing the flashing yellow light, he was authorized to proceed through the intersection, but he had a duty to do so 'with caution.' La.R.S. 32:234(A)(2)." *Id.* at 410. Mr. Brooks, we concluded, "had a duty to stop before entering the intersection and yield the right of way to traffic on Main Street. La.R.S. 32:234(A)(1)." *Id.* at 410. DOTD, we concluded, had a duty to "maintain the public highways in a condition that is reasonably safe for persons exercising ordinary care and reasonable prudence." [*Toston v. Pardon*, 03-1747 (La. 4/23/04), 874 So.2d 791] at 799." *Id.* at 413. Nothing in the supreme court opinion would suggest that these legal duties were not owed to the respective parties involved in this litigation, and we now reaffirm those determinations.

6

The record contains no direct eyewitness account of the accident. Ms. Phillips died of her injuries, Mr. Brooks did not testify, and Mr. Fontenot could remember nothing about the accident because of an amnesic disorder arising from the injuries he sustained. The second-hand testimony of the officer who questioned Mr. Brooks on the night of the accident revealed that Mr. Brooks told him that after stopping at the red flashing light on Morgan Street, and seeing no vehicles approaching on Main Street, he pulled into the intersection where he was struck by Mr. Fontenot's vehicle. The remainder of the pertinent testimony was presented by expert witnesses.

With regard to Mr. Fontenot's fault, DOTD provided the testimony of Dr. Andrew McPhate, an expert in mechanical engineering and vehicle dynamics. Dr. McPhate testified that while he did not fully reconstruct the accident, based on the information he gathered, he concluded that Mr. Fontenot applied his brakes before impact, and was traveling fifty-six miles per hour at the time of impact.[6]

"In evaluating the evidence, the trier of fact should accept as true the uncontradicted testimony of a witness . . . where the record indicates no sound reason for its rejection." *Robertson v. Scanio Produce & Inst. Foods, Inc.*, 449 So.2d 459, 462 (La.1984). For the purposes of this review, we accept this speed estimation as true. However, speed in excess of the posted speed limit[7] by a motorist involved in an accident does not in and of itself require a finding of liability. *Loveday v. Travelers Ins. Co.*, 585 So.2d 597 (La.App. 3 Cir.), *writ denied* 590 So.2d 65 (La.1991).

---

[6]The speed limit for traffic on both streets at the intersection was thirty-five miles per hour.

[7]Louisiana Revised Statutes 32:42 does allow a police officer to violate the speed limit under certain limited circumstances. However, the facts before us does not grant that privilege to Mr. Fontenot in this case.

In this matter, DOTD did establish that Mr. Fontenot was speeding, but did not establish the excessive speed to be a cause-in-fact of the accident. As we stated in our original opinion,

> While Dr. McPhate testified to speed at impact, he offered no opinion that would connect the vehicle's speed to the cause of the accident. Thus, DOTD failed to establish the "but for" portion of the cause-in-fact test. That is to say, DOTD offered no evidence to establish that, but for Mr. Fontenot's excess speed the accident would not have happened. While such a scenario is possible, there was no evidence presented to establish that possibility as a fact, or even a probability. To reach that conclusion based solely on the speed of the vehicles would be mere speculation on our part. Thus, we find that DOTD failed to meet its initial burden of proof to show that Mr. Fontenot's actions contributed to the collision.

*Fontenot*, 972 So.2d at 410.

Whether we apply *de novo* principles or those of a manifest error analysis, the conclusion is the same. DOTD failed to establish that Mr. Fontenot's breach of his duty to travel within the speed limit was a cause-in-fact of the accident sued upon. Thus, we find that the jury was manifestly erroneous in assessing Mr. Fontenot with any percentage of fault.

We do, however, find that the jury did not err in assessing Mr. Brooks with fault in causing the accident. He clearly breached his duty to yield the right of way to traffic on Main Street even if he stopped at the flashing red light. As we explained in our original opinion,

> Because the intersection did not contain a cross-walk or a stop bar,[11] Mr. Brooks had a duty to stop at a point where he had a view of approaching traffic on Main Street, and to not proceed if he observed any traffic approaching on Main Street that would constitute an immediate hazard if he attempted to enter the intersection. [*Loveday,* 585 So.2d 597]; La.R.S. 32:123(B). As stated in *Toston v. Pardon*, 874 So.2d 791, 802,
>
>> [S]topping is only half the duty, the other half is not to proceed until the determining that the way is clear. *Guillot v. Valley Forge Ins. Co.*, 99-1044, p. 4 (La.App. 3 Cir.

12/8/99), 753 So.2d 891, 894. The second duty is heavier and requires an even greater degree of care when the intersection is blind, or partially obstructed. *Continental Ins. Co. v. Duthu*, 235 So.2d 182, 186 (La.App. 4 Cir.1970). A driver entering a superior highway where his view is obstructed is under a duty to proceed with extraordinary caution. *Taylor v. State*, 432 So. 2d (La.App. 2 Cir.1983).

As this court recognized in *McCauley v. LaFleur,* 213 So.2d 176, 179 (La.App. 3 Cir. 1968), "[t]o stop and then proceed in the immediate path of oncoming vehicles constitutes negligence."

[11] The stop bar is referred to as a "limit line" in La.R.S. 32:234(A)(1).

*Fontenot*, 972 So.2d at 410-11.

The finding of fault on the part of Mr. Brooks is clearly supported by the expert testimony presented to the trial court. Dr. McPhate described the library's location as creating a "blind intersection." Accepting the statement he gave the investigating officer as true, it is obvious that Mr. Brooks stopped at a point where the library building obstructed his view. Otherwise, he would have seen Mr. Fontenot's oncoming vehicle and would not have pulled into the intersection, and the accident would not have happened. The jury was not manifestly erroneous in concluding that Mr. Brooks' negligence was a cause-in-fact of the accident.

In our prior opinion, we stated the following concerning proof of DOTD's negligence:

In a tort action against DOTD, whether based on strict liability or negligence, the plaintiff must show: (1) the property which caused the damage was in the custody of the DOTD, (2) the property was defective because it had a condition that created an unreasonable risk of harm, (3) DOTD had actual or constructive notice of the risk, and (4) the defect in the property was a cause-in-fact of the plaintiff's injuries. *Toston*, 874 So.2d 791. The analysis under either theory, strict liability or negligence, is the same. *Id.* DOTD's duty is to "maintain the public highways in a condition that is reasonably safe for persons exercising ordinary care and reasonable prudence." *Id.* at 799. To that end, the

9

> design of a controlled intersection must "not present an unreasonable risk of harm to motorists." *Id.*

*Fontenot*, 972 So.2d at 413.

It is undisputed that DOTD had custody and control of the intersection. Thus, that element of proof is not at issue. As to the remaining issues, the testimony, primarily in the form of expert testimony, is conflicting.

Mr. Burnham testified that at least four defects caused the intersection to be an unreasonable risk of harm to motorists. He first suggested that proper engineering design of the intersection would require a 250 foot sight distance for traffic on Morgan Street looking in the direction of Mr. Fontenot's approaching vehicle, and that the failure to use a stop bar in the traffic lane left Mr. Brooks in the dark as to the appropriate stopping point. If he choose the wrong spot, he could limit his sight distance to as little as one hundred feet, thereby leaving him an inadequate distance in which to make a decision to proceed.

Next, Mr. Burnham testified that the absence of the stop bar, particularly at night, was in and of itself a defect. The stop bar was, he suggested, not only required by DOTD's own PM-01 standard plan, but also by the Manual on Uniform Traffic Control Devices (MUTCD) promulgated by the National Committee for Uniform Traffic Control Devices (NCUTCD).[8] The stop bar's primary purpose, according to Mr. Burnham, is to give the approaching motorist assistance in locating the optimum point for making the decision to safely traverse the favored roadway. He could find no justification for not providing the stop bars in the approaching lanes of this intersection, and that failure created a hazardous condition at this intersection.

---

[8]Mr. Burnham served on the NCUTCD and was one of the contributors to the development of the MUTCD. He also served on committees of the American Association of State Highway and Transportation Officials (AASHTO) which addressed traffic control and safety standards.

Mr. Burnham also noted that DOTD had not performed a traffic engineering update of this intersection since installation of the traffic signal over twenty years before the accident. He suggested that such a study would have included a review of the accident patterns, the type of traffic at the intersection, and the nature of the traffic both day and night. Specifically, such a study would have revealed the eighteen collision-type accidents that had occurred at this intersection prior to the accident at issue in this litigation, eleven of which involved traffic approaching from the same direction as Mr. Fontenot. Knowledge of such events would have emphasized to DOTD's planning engineers the need for the stop bars.

Finally, Mr. Burnham asserted that the intersection would have been made much safer had DOTD not chosen to program the traffic signal to switch to flashing signals at 11:00 p.m. each night. According to Mr. Burnham, a much safer method would had been to maintain the light on a red-yellow-green sequence twenty-four hours per day, but on an actuated basis. That is to say, in the late-night hours, the light would remain on green for Main Street unless and until a vehicle approached on Morgan Street. Then and only then would the signal cycle to green on Morgan Street.

Dr. Jack Humphries, DOTD's expert in traffic engineering and highway design, disagreed with Mr. Burnham concerning the importance of the stop bar on the through street. His solution was to leave each individual driver with the obligation to select a point which did not encroach on Main Street yet would allow unrestricted vision on Main Street. Concerning Mr. Burnham's suggestion that the signal light not be cycled to a flashing light late at night, he testified that his research revealed that problems as described by Mr. Burnham have not been prevalent at intersections involving streets of lesser classifications than arterial, and in this case only one, Main

11

Street, was an arterial. Also, he observed that the MUTCD does not prohibit flashing lights, especially for late-night, low-volume traffic, and that the use of such signals is a matter of engineering judgment. However, he acknowledged that his one visit to the intersection occurred in the daylight hours, that the pictures he relied upon in his study were also taken in the daytime, and that they were taken on the opposite side of the intersection from the direction of travel of the Brooks car. His ultimate opinion was that Mr. Brooks' failure to comply with his duty to stop at a point where he could see approaching traffic was the sole cause of the accident.

The actual or constructive notice requirement was satisfied by the testimony of DOTD employees who work in the district where the intersection is located. Michael Moss, the district maintenance engineer, and Charles Moran, the district maintenance superintendent, both testified concerning the intersection inspection procedure, and both established that DOTD inspected the intersection once every two weeks. However, according to the two men, the inspection was for the limited purpose of determining what, if anything, needed to be repaired. Richard Savoie, a project development engineer in DOTD's road design section, testified that when the widening and overlay project was completed in 2000, stop bars were placed only in the turning lanes of the four approaches, and at a distance away from the intersection itself. He explained that the purpose of a stop bar in the turning lane is to establish the point at which a vehicle should stop in order to avoid being "clipped" by a vehicle coming from another direction and turning left onto the street. It is not to be used as a stopping guide for through traffic.

With regard to the intersection construction project, the record reflects that DOTD maintains a set of standard plans referred to as the PM-01 plan which calls for

12

stop bars in the through lanes as well as the turning lanes in any given project. However, the design engineer for a particular intersection can choose to deviate from this standard plan, and his or her decision is controlling. In the case of the Main Street/Morgan Street intersection, the design engineer chose not to require stop bars in the through lanes. Unfortunately, the record is silent concerning the reason for this decision.

When we previously considered the fault of DOTD under the *de novo* standard of review, we stated the following:

> Based on the facts regarding this intersection and Mr. Burnham's reasoning, which we accept in preference to that of any other expert testifying, we find that the defective condition of the intersection and its signing created an unreasonably dangerous condition and was a cause-in-fact of the accident. Dr. McPhate and Mr. Burnham both testified that at night the library building in the northwest corner of the intersection presented an obstruction to view to traffic entering the intersection on Morgan Street; Mr. Burnham opined that the sight obstruction of the library building at night, together with the absence of a stop bar on the Morgan Street through lane, presented a motorist proceeding south on Morgan street with no guidance on the optimal stopping location. Furthermore, the presence of the stop bar in the turning lane was deceptive because it could mislead a driver into thinking that was a safe stopping location, whereas it was not. Mr. Burnham made a connection between the number of accidents at the intersection and the unexplained disregard of DOTD's own standard requiring stop bars in all approaches. Dr. Humphries's testimony did not detract from Mr. Burnman's well reasoned opinion, as Dr. Humphries's opinion was conclusory and without reasoned foundation.

> We also find more convincing Mr. Burnham's testimony regarding the deficiency in the traffic signal. His documented explanation of the risk in converting to a flashing mode at 11:00 p.m. is reasonable, as were his alternatives to this action. On the other hand, DOTD's evidence focused primarily on its attention to proper maintenance of the signals—a nonissue in this litigation. At best, Dr. Humphries established that the installation of a flashing light was not itself a violation of AASHTO or MUTCD minimum standards. He did not address the effect of the flashing system at this particular intersection.

DOTD also argues that it proved it had discharged its duty of care to the motoring public because the evidence at trial established that the intersection at issue met the AASHTO and MUTCD standards or requirements. DOTD argues that because the intersection met these standards or requirements, it is entitled to the presumption of La.R.S. 32:235(E) that it is without fault in causing the accident. We disagree that DOTD is entitled to the presumption provided in that statute. Louisiana Revised Statutes 32:235(E) provides that if there exists proof that, at the time of the accident, DOTD was "in compliance with the provisions of the department's traffic control devices manual shall be prima facie evidence of discharge by [DOTD] of its obligations to the motoring public." Simply stated, the evidence establishes that DOTD was not in compliance with its own traffic control devices manual in that it failed to install stop bars for the through lands.

We also find that DOTD had knowledge of the possible defects in the intersection. In *Hammons v. City of Tallulah*, 30,091 (La.App. 2 Cir. 12/10/97), 705 So.2d 276, *writ denied*, 98-407 (La. 3/27/98), 716 So.2d 892 and 98-440 (La. 3/27/98), 716 So.2d 894, constructive knowledge of a hazardous condition sufficient to allow recovery against a public body was based on facts demonstrating that the defective condition had existed for such a period of time that it should have been discovered and repaired if the public body had exercised reasonable care. In the present case the blind intersection was as old as the library building and the traffic light had been present for more than twenty years. Additionally, the accident records of the Town of Broussard demonstrated that of the eighteen accidents occurring at that intersection, more than half involved traffic traveling east on Main. The long-term existence of the hazardous conditions and the accident history at this intersection was sufficient to establish that the DOTD had actual or constructive notice that it was not in compliance with its own standards. *See Cole v. State ex rel. Dept. of Transp. & Dev.*, 99-912 (La.App. 3 Cir. 12/22/99), 755 So.2d 315, *writ denied*, 00-199 (La. 4/7/00) 759 So.2d 766. We have no hesitancy finding that DOTD knew or should have known that the intersection posed an unreasonable risk.

*Fontenot*, 972 So.2d at 413-14.

When we reached this conclusion, we were applying the *de novo* standard of review.

In applying the manifest error standard of review, we reach the same conclusion.

That is to say, while recognizing the conflicts in the testimony of the experts

testifying for the Fontenots and DOTD, we do not find that there are different, yet

permissible, views of the evidence; and we find that the jury's conclusion that DOTD

was not at fault was not a reasonable one. *See Stobart v. State, through Dep't of Transp. & Dev.*, 617 So.2d 880 (La.1993).

### *Apportionment of Fault*

Having concluded that the accident at issue was caused by the negligence or fault of both Mr. Brooks and DOTD, we turn to the apportionment of fault between these two parties. The ruling case law on this issue is *Watson v. State Farm Fire & Cas. Ins. Co.*, 469 So.2d 967 (La.1985), wherein the supreme court identified various factors that may influence the degree of fault assigned, including:

> (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought.

*Watson*, 469 So.2d at 974. However, if we find manifest error in the jury's apportionment of fault, we may adjust the award "only to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion." *Clement v. Frey*, 95-1119, 95-1163, pp. 7-8, (La. 1/16/96), 666 So.2d 607, 611.

Applying the *Watson* factors and following the guidance required by *Clement*, we reduce Mr. Brooks' fault to sixty percent and assign the remaining forty percent to DOTD.

### *Damages*

With regard to the trial court award of general damages, we reviewed that issue previously with the following language:

> On appeal DOTD questions only the amount of general damages awarded to Mr. Fontenot. Specifically, DOTD asserts that the trial court "committed manifest error by amending the jury verdict by JNOV to add

15

$500,000 in general damages." This assertion is premised on the argument that the trial court award was an additur and not a JNOV.

An additur may be entered "only if the issue of quantum is clearly and fairly separable from other issues in the case." La.Code. Civ.P. art 1814. In its brief, DOTD declares that "the parties agreed for the judge to grant an *additur* in lieu of a new trial and to reform the jury verdict accordingly, since the damage issue was separable from liability issues." Then, observing that "*additur* only allows reformation of the award to the lowest reasonable amount," DOTD sums up its briefed argument in support of this assignment with the contention that the $500,000.00 JNOV was excessive.

We have carefully examined the proceedings in relation to the motion for a JNOV, or in the alternative a motion for a new trial, and we find nothing in the record to suggest either an agreement between the parties or DOTD's consent to convert the motions to an additur. Mr. Fontenot's motion was for a JNOV, and the judgment rendered by the court was plainly and simply a JNOV. Inasmuch as DOTD has made no factual argument and no valid legal argument that the JNOV was improperly granted or that it was excessive, there is nothing further for us to review concerning this assignment of error. The assignment has no merit.

*Fontenot*, 972 So.2d at 415.

Nothing before us suggests that we erred in this assessment. Therefore, we will not revisit this issue.

## DISPOSITION

For the foregoing reasons, we find manifest error in the jury's allocation of fault, reverse its allocation, and reallocate fault in causing the accident by assessing Germaine Brooks with sixty percent of fault in causing the accident sued upon and assessing the State of Louisiana, Department of Transportation and Development with the remaining forty percent. We affirm the jury's quantum award as amended by the trial court's grant of the judgment notwithstanding the verdict in all respects. Accordingly, we render judgment in favor of Randy and Susanne Fontenot, individually and on behalf of their minor daughter, against the State of Louisiana,

16

Department of Transportation and Development, for forty percent of all damages awarded, and in favor of Randy and Susanne Fontenot, individually and on behalf of their minor daughter, against Germaine Brooks and Louisiana Insurance Guaranty Association for sixty percent of all damages awarded. We affirm the judgment awarding legal interest according to law but providing that Louisiana Insurance Guaranty Association is responsible for legal interest on its obligation only from March 17, 2003. We recast the judgment for costs, ordering that the State of Louisiana, Department of Transportation; Germaine Brooks; and Louisiana Insurance Guaranty Association shall be responsible for court costs, including cost of this appeal, in proportion to their fault. Pursuant to the requirement of La.R.S. 13:5112(A), we set the forty percent share of costs assessed to the State of Louisiana, Department of Transportation and Development in a monetary amount, $21,882.31 in lower court costs and $6,709.35 in appellate costs.

**AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.**

17

RANDY FONTENOT, ET AL.

VERSUS

PATTERSON INSURANCE, ET AL.

**PICKETT, J., dissenting.**

On remand, the supreme court has instructed us to review the jury's verdict using the manifest error standard of review. That standard of review was set forth very clearly in *Rosell v. ESCO*, 549 So.2d 840, 844-845 (La.1989) (citations and footnote omitted):

> It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. In applying the manifestly erroneous--clearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo.

> When findings are based on determinations regarding the credibility of witnesses, the manifest error--clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the

1

witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.

When we originally heard this case, I explained in my dissent that the majority was wrong in determining that the jury erred in finding that Mr. Fontenot was not at fault. My view has not changed. I continue to believe that the jury was not manifestly erroneous in setting Mr. Fontenot's percentage of fault at 10%. I agree with the statement in *Loveday v. Travelers Insurance Co.*, 585 So.2d 597 (La.App. 3 Cir.), *writ denied*, 590 So.2d 65 (La.1991), that driving in excess of the posted speed limit does not require a finding of liability. However, I believe that the jury was not clearly wrong in its determination that driving 21 miles per hour over the posted speed limit at night when approaching a flashing caution light contributed to the accident.

I also believe that the jury's determination that the state was not liable is not manifestly erroneous. The jury heard two permissible views of the evidence, and found in favor of DOTD. I find that the jury's determination was reasonable, and I would not disturb the jury's allocation of fault. For these reasons, I respectfully dissent from the majority's finding of manifest error, its re-allocation of fault, and the distribution of costs.

2